IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHN SEASTRAND, an individual,<br><br>Plaintiff,<br><br>v.<br><br>U.S. BANK, N.A., a nationally chartered bank; RALPH PACE, an individual acting in his official capacity as an officer and employee of U.S. BANK, N.A.; JACKLYN W. MILLER, GARY S. MILLER, JAY M. MINNICK, individuals; MILLER DEVELOPMENT COMPANY, INC., a Utah corporation; MILLER MINNICK ASSOCIATES I, LLC and MILLWOOD COMPANIES, LC, Utah limited liability companies; and JOHN DOES 1-10<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT U.S. BANK'S MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:17-CV-214 TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Defendant U.S. Bank's Motion for Summary Judgment. For the reasons discussed below, the Court will grant the Motion.

## I.   INTRODUCTION

John Seastrand ("Plaintiff") was employed by U.S. Bank, N.A. ("U.S. Bank" or "Defendant") from 2002 to 2016.[1] Most recently, he served as the Market Manager for Salt Lake City.[2]   In that role, Mr. Seastrand was responsible for running the commercial real estate group. His duties included growing revenue, communicating with clients, and leading a team of several

---

[1] Docket No. 67 Ex. Y, at 345–46.
[2] *Id.* at 356.

1

direct reports.[3]  As described in greater detail below, Mr. Seastrand was terminated in 2016 after a large loan he was involved with went into default.  U.S. Bank claims that Mr. Seastrand was terminated because he demonstrated poor judgment in connection with this loan.  Plaintiff brings a claim of age discrimination against U.S. Bank under the Age Discrimination in Employment Act ("ADEA").

## II.  BACKGROUND

In 2015, U.S. Bank agreed to lend Miller Development Company and an associated LLC, Miller Minnick Associates (collectively, "the Millers"), a construction loan of $46,850,000.[4] According to U.S. Bank, the entire amount of a loan is not typically dispersed immediately. Rather, disbursements are made on a rolling basis as the project progresses.[5]  At or around the time of closing in July 2015, the Millers requested an initial advance of $6,800,000.[6]  Approximately $4,300,000 of these funds were for the purpose of purchasing building materials that would be stored until their use in the project.[7]  According to U.S. Bank, such a large draw was "abnormal,"[8] and "went outside of any norm that U.S. Bank would normally approve."[9]  U.S. Bank alleges that Plaintiff approved the $6,800,000 advance without elevating the issue to his superiors.[10]

U.S. Bank later became concerned about the project due to lack of construction progress and rumors that the Millers were experiencing cash flow issues.[11]  On April 5, 2016, U.S. Bank

---

[3] *Id.* at 21.
[4] *Id.* Ex. F, at 7.
[5] Docket No. 66, at 9; *see also* Docket No. 67 Ex. FF ¶¶ 9,11.
[6] Docket No. 67 Ex. G.
[7] Docket No. 2 Ex. 1, ¶ 54–55.
[8] Docket No. 66, at 10; *see also* Docket No. 67 Ex FF ¶ 11.
[9] Docket No. 65 at 11.
[10] *Id.* at 12.
[11] Docket No. 67 Ex. Y, at 111; *Id.* Ex. DD, at 83–87.

ordered a site inspection, which led to the discovery that the Millers had only $761,000 worth of stored materials for the project—despite the large disbursement of funds to purchase materials and the fact that construction had yet to begin.[12]  U.S. Bank sent a notice of default on April 15, 2016.[13] John Seastrand was terminated on April 29, 2016.[14]  On June 30, 2016, U.S. Bank filed a lawsuit in state court to recover the funds lent to the Millers.[15]

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[16]  In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[17]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[18]

### IV. DISCUSSION

Plaintiff brings a claim under the ADEA.[19]  Because Plaintiff "did not present direct evidence of age discrimination, his ADEA claim is analyzed under the method of proof outlined

---

[12] Docket No. 66, at 4; *see also* Docket No. 67 Exs. H, I.
[13] Docket No. 67 Ex. J.
[14] *Id.* Ex. Y, at 144.
[15] *Id.* Ex. V.
[16] Fed. R. Civ. P. 56(a).
[17] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).
[18] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).
[19] Docket No. 2 Ex. 1, at 18.

in *McDonnell Douglas Corp. v. Green*."[20]   Under that framework, Plaintiff must first establish a prima facie case of discrimination.[21]   If a plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.[22]   Once the defendant articulates a legitimate, non-discriminatory reason for its action, the burden shifts back to the plaintiff to prove, by a preponderance of the evidence, that the defendant's reasons are pretextual.[23]

For purposes of this motion, the Court can assume that Plaintiff has presented a prima facie case and that Defendant has articulated legitimate nondiscriminatory reasons for termination. Therefore, the Court will focus on whether a reasonable jury could find U.S. Bank's articulated reasons for terminating Mr. Seastrand pretextual.

Under the *McDonnell Douglas* framework, in order to survive a motion for summary judgment, the plaintiff "must present evidence to establish there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action was pretextual."[24]   "A showing of pretext does not require a plaintiff to offer any direct evidence of actual discrimination."[25]   "A plaintiff may show pretext by demonstrating the 'proffered reason is factually false,' or that 'discrimination was a primary factor in the employer's decision.'"[26]

---

[20] *McMahen v. Gaffey, Inc.*, 52 F. App'x 90, 91 (10th Cir. 2002). *See McDonnel Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).

[21] *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969 (10th Cir. 2017).

[22] *Id.* at 970.

[23] *Id.*

[24] *Id.* at 970–71.

[25] *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[26] *DePaula*, 859 F.3d at 970 (quoting *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013)). *See also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000) ("A plaintiff's prima facie case of discrimination, combined with sufficient evidence for a reasonable factfinder

Summary judgment should not be granted where the employer's reasons are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief."[27]

The Court must consider whether the employer honestly believed the reasons given for termination, and whether the employer acted in good faith.[28] However, the Court "may not second guess the business judgment of the employer,"[29] or consider whether its reasons were "wise, fair, or correct."[30]

Plaintiff contends that U.S. Bank's reason for firing him is false and that age was a primary factor in US Bank's decision to terminate him. The discussion below considers each argument in turn. Before proceeding to that discussion, the Court notes that Plaintiff has presented the Court with starkly conflicting facts in responding to Defendants' Motions for Summary Judgment.

In his Complaint, in addition to the age discrimination claim, Plaintiff also alleged conspiracy, fraud, negligence, and intentional interference with economic relations. These claims were brought against defendants Jacklyn W. Miller, Gary S. Miller, Jay M. Minnick, Miller Development Company, Inc., Miller Minnick Associates I, LLC, and Millwood Companies, LC

---

to reject the employer's nondiscriminatory explanation for its decision, may be adequate to sustain a finding of liability for intentional discrimination under the ADEA.").

[27] *Paup v. Gear Prod., Inc.*, 327 F. App'x 100, 111 (10th Cir. 2009) (quoting *Young v. Dillon Co.*, 468 F.3d 1243, 1250 (10th Cir. 2006)).

[28] *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007).

[29] *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017).

[30] *Rivera v. City & Cty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) (internal citations omitted).

(collectively, "the Miller Defendants").[31]  Essentially, Plaintiff alleged that the Miller Defendants misled him and caused him to support the stored materials draw—which led to his termination.[32]

These claims were dismissed on January 8, 2019, per a stipulated motion from the parties.[33] Previous to that, the Miller Defendants filed a motion for summary judgment on October 16, 2018,[34] and Plaintiff filed a memorandum in opposition on November 27, 2018.[35]  The Court struck Plaintiff's memorandum from the record because it was filed out of time.[36]

As discussed below, in opposing U.S. Bank's Motion for Summary Judgment, Plaintiff minimizes his role in approving the stored materials draw.  Plaintiff claims that he did not have the authority to approve it,[37] that his personal judgment was inconsequential because many other people were involved in the approval process,[38] and that U.S. Bank was not exposed to financial risk as a result of the stored materials draw.[39]

Plaintiff made contrary representations in opposing the Millers' motion for summary judgment.  He argued that, but for the Millers' misrepresentations to him, the stored materials draw would not have been granted,[40] that he exercised his judgment and chose to support the stored materials draw because he believed what the Millers told him,[41] and, that the financial risks to U.S.

---

[31] Docket No. 2 Ex. 1, at 17–29.
[32] *Id.* at 18, 24, 27, 28–29.
[33] Docket No. 105.
[34] Docket No. 64.
[35] Docket No. 89.
[36] Docket No. 92.
[37] Docket No. 103, at 34.
[38] *Id.* at 21–22.
[39] *Id.* at 34.
[40] Docket No. 89, at 14, 24.
[41] *Id.* at 14, 20–22,

Bank were so obvious that the Millers should have foreseen Plaintiff's termination as a result of their alleged fraud.[42]

Plaintiff attempts to reconcile these positions by arguing that, by defrauding him, the Millers supplied U.S. Bank with the pretext to fire him.[43]  However, this argument fails to explain how Plaintiff could not have approved the stored materials draw, but was the but for cause of the draw being granted.  Or how his personal judgment was inconsequential, but the decision to grant the draw was critically influenced by the misinformation given to him by the Millers.  Or how there was no financial risk to U.S. Bank, but the Millers should have foreseen that the obvious financial risk to U.S. Bank would result in Plaintiff's termination.  The Court cannot countenance such reckless play with the facts.

*a. Plaintiff's contention that the proffered reasons for his termination are false.*

Plaintiff offers several reasons why he could not have been fired for his role in approving the stored materials draw, including that he did not solely authorize the stored materials draw and did not have the authority to do so, he acted within bank policy, there was no financial risk to the bank, U.S. Bank did not perform an adequate investigation before terminating him, the decision to terminate him was disproportionately influenced by a single individual, U.S. Bank gave inconsistent reasons for his termination, and U.S. Bank's witnesses lack credibility.[44]    As discussed below, individually and collectively, these arguments fail to show that U.S. Bank's

---

[42] *Id.* at 28, 31.
[43] *Id.* at 33.
[44] Docket No. 103, at 33–44.

stated reason for Plaintiff's termination is "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief."[45]

1. Approval of the stored materials draw

Mr. Seastrand contends that senior bank leadership approved the stored materials draw because they were involved in approving the underlying loan and an initial draw for stored materials was contemplated in U.S. Bank's internal loan approval documents.[46] However, the size of the draw was not specified.[47] U.S. Bank argues that, under the circumstances, an initial draw of $6,800,000 was abnormal and outside of the bank's norms.[48] Mr. Seastrand's testimony appears to support the assertion that such a large amount was not anticipated. In his deposition, he recognized this was not a draw the bank would grant in the ordinary course of business, but was an "accommodation" that he felt should be considered for a long-time client.[49]

Plaintiff also alleges that the draw was approved by senior leadership because, months after the draw was dispersed, several senior officials, including Ralph Pace, Karl Keiffer, and Kurt Huppert, signed off on an internal document ("SCD"), which stated that the outstanding loan amount was $7,830,356, that the project was only 2 percent complete, and that 20 percent of hard costs had been distributed.[50] Plaintiff argues that "[h]ad the stored materials draws equating to 20% of hard costs not been authorized for a project that was only 2 percent completed, seasoned bank employees like Huppert and Pace would have said something before signing the SCD."[51]

---

[45] *Paup*, 327 F. App'x at 111 (10th Cir. 2009) (quoting *Young*, 468 F.3d at 1250)).
[46] *See, e.g.*, Docket No. 103, at 9, 11, 13, 17.
[47] Docket No. 67 Ex. E, at 34.
[48] Docket No. 66, at 10.
[49] Docket No. 67 Ex. Y, at 404–05.
[50] Docket No. 103, at 6, 9, 12, 14, 17, 21, 34.
[51] *Id.* at 12.

However, there is no evidence to support this argument. The Court declines to second-guess the business judgment of bank officials, or to speculate about what they were thinking when they signed this document.

Plaintiff also argues that he could not have authorized the stored materials draw because he lacked the authority.[52] However, his testimony suggests that he played an integral role in approving the draw. He testified that the loan administrator who received the stored materials request called Mr. Seastrand for his guidance about how to proceed.[53] Mr. Seastrand instructed the loan administrator that the two of them would look at bank policy and submit the draw to the U.S. Bank's Credit Department for approval unless it was proscribed by policy.[54] U.S. Bank claims that Mr. Seastrand never elevated the issue to the Credit Department or his direct supervisor.[55] Plaintiff has not offered any evidence to the contrary. Moreover, as stated, Mr. Seastrand asserted in his response to the Miller Defendants' motion for summary judgment that he was the cause of the draw being granted.

### 2. U.S. Bank's financial risk

Mr. Seastrand argues that U.S. Bank was not exposed to any financial risk; given the significant wealth of the Miller companies, in addition to the personal wealth of Mr. and Mrs. Miller, "there was no chance that U.S. Bank would not be repaid, and everyone knew it."[56] However, it is reasonable to assume that U.S. Bank could have genuinely believed that it incurred at least some financial risk as a result of a $46,000,000 loan going into default. The record supports

---

[52] *Id.* at 7, 34.
[53] Docket No. 67 Ex. Y, at 81–82.
[54] *Id.* at 82.
[55] Docket No. 66, at 18.
[56] Docket No. 103, at 34.

this assumption.  U.S. Bank's efforts to recover the loan resulted in a "discounted payoff" where the bank accepted a loss of over $375,000.[57]  And, again, argued in response to the Miller Defendants' motion for summary judgment that the risk to the bank was obvious.

3.  U.S. Bank's investigation

Mr. Seastrand's argues that the proffered reason for his termination can be disbelieved because U.S. Bank did not perform an adequate investigation.  Plaintiff cites *Smothers v. Solvay Chemicals, Inc.* for the proposition that "[f]ailure to conduct what appeared to be a fair investigation of the violation that purportedly prompted adverse action may support an inference of pretext."[58]  However, the facts of that case differ materially from the case at hand.  In *Smothers*, the employer fired an employee without ever hearing the employee's side of the story.[59]  In this case, both parties acknowledge that Mr. Seastrand spoke with Mr. Pace privately over the phone about the stored materials draw, and that it was discussed on a conference call that both Mr. Pace and Mr. Seastrand participated in.[60]  Therefore, *Smothers* does not apply.[61]  Plaintiff has not presented any evidence to show that the procedures followed were irregular for U.S. Bank or that they indicate that decision makers did not honestly believe Mr. Seastrand exercised poor judgment.

4.  Discriminatory animus of a subordinate

Mr. Seastrand also argues that Defendant's reason is pretext because a single person with discriminatory animus drove the decision to terminate him.  Mr. Seastrand relies on *EEOC v. BCI*

---

[57] Docket No. 67 Ex. W, at 2, 4.

[58] 740 F.3d 530, 542 (10th Cir. 2014) (quotation marks omitted).

[59] *Id.*

[60] Docket No. 67 Ex. FF, at 6–8; *id.* Ex. Y, at 140–41, 461–62.

[61] *See Estate of Bassatt v. Sch. Dist. No. 1 in the City & Cty. of Denver*, 775 F.3d 1233, 1240 (10th Cir. 2014) ("While the Estate relies on *Smothers* for this proposition, there the employer never heard the plaintiff's side of the story before firing him. That is not the case here.").

*Coca-Cola Bottling Co. of Los Angeles.*[62] In that case, the Tenth Circuit considered what standard to apply in evaluating claims that a biased subordinate caused a decision maker to take an adverse employment action.[63] In this case, there is no evidence that a biased subordinate influenced the decision to terminate Mr. Seastrand. Because this "cat's paw" doctrine does not apply to the case before the Court, this argument does not create a genuine issue of material fact.

    5. Inconsistency of reasons for termination

    Plaintiff also argues that Defendant's reasons for terminating him were inconsistent. As the Tenth Circuit held in *Mathews v. Euronet Worldwide*, inconsistent reasons can be evidence of pretext.

> [A] a post-hoc justification given at the time of trial, which differs from the reasons given at the time of termination and is unsupported by the evidence, could lead a reasonable jury to infer that the reason asserted at trial is pretextual. On the other hand, there is no support for a finding of pretext if the employer does not give inconsistent reasons, but instead merely elaborates on the initial justification for termination.[64]

    Plaintiff's primary complaint in this regard is that Ralph Pace's explanation for his termination contradicts the reason U.S. Bank gave in its EEOC filing. Ralph Pace's explanation to Plaintiff was that he was being terminated because he had lost "credibility due to the Miller situation."[65] In its EEOC filing, US Bank alleged that Plaintiff was terminated "[a]s a result of poor judgment in this matter [the Miller loan], coupled with previous instances of exercising poor judgment."[66] U.S. Bank elaborated on Mr. Seastrand's previous performance issues, including

---

[62] 450 F.3d 476 (10th Cir. 2006).
[63] *Id.* at 48
[64] 271 F. App'x 770, 773–74 (10th Cir. 2008) (internal quotations and citations omitted).
[65] Docket No. 67 Ex. Y, at 144.
[66] Docket No. 103 Ex. EEE, at 4.

that he proposed that a client hire him, and, when the client refused, he became hostile and refused to assist the client.[67]  U.S. Bank also referenced a 2013 performance review noting that Plaintiff had created risk to the Bank through lack of attention to detail in account and portfolio management.[68]

These asserted deficiencies do not contradict the broader justification for Mr. Seastrand's termination—that he exercised poor judgment.  Because "the employer [did] not give inconsistent reasons, but instead merely elaborated on the initial justification for termination,"[69] there is no support for a finding of pretext.

Plaintiff contends that U.S. Bank's reason for his termination is inconsistent because he received positive performance reviews in the past.[70]  This argument is not responsive to the U.S. Bank's stated reason for Plaintiff's termination—exercising poor judgment with regard to the stored materials draw.[71]  Because U.S. Bank's explanation is that Plaintiff was fired for a specific instance of bad judgment, Plaintiff's past performance on unrelated matters does not create a genuine dispute of material fact.

6.  Witness credibility

Plaintiff also argues that U.S. Bank's witnesses lack credibility because their accounts of events conflict.[72]  Plaintiff contends that the three U.S. Bank officials who made the decision to terminate him gave different accounts of who led that discussion.  The three decision makers were

---

[67] *Id.* at 3.
[68] *Id.*
[69] *Mathews*, 271 F. App'x at 774.
[70] Docket No. 103, at 37–38.
[71] Docket No. 66, at 8, 10.
[72] Docket No. 103, at 38–39.

Ralph Pace, Regional Manager, Brian Bebel, Director of Human Resources, and Rex Rudy, Head of Commercial Real Estate.

Plaintiff also argues that these individual decision makers may have given different weight to an incident in 2011 involving Mr. Seastrand. As discussed above, according to U.S. Bank, Mr. Seastrand exhibited poor judgment on a prior occasion when he solicited an employment opportunity from its client Morinda.[73] Decision makers took this incident into account when considering whether to terminate Mr. Seastrand.[74]

Regardless of who led the discussion to terminate plaintiff, and whatever weight decision makers gave to a prior instance of poor judgment, Plaintiff does not present any evidence that a decision was not reached to terminate Mr. Seastrand, or that it was not unanimous, or that the decision was not based on the stored materials draw.

Plaintiff also asserts that Rex Rudy's testimony conflicts with Ralph Pace and Kurt Huppert's (Senior Credit Officer), because Mr. Rudy identified a number of factors in favor of the stored materials draw, which the others opposed. According to Plaintiff, these factors included the "relationship with the Millers, their net worth, and their building practices."[75] Plaintiff references Mr. Rudy's deposition but does not provide a pincite. "Judges are not like pigs, hunting for truffles buried in briefs."[76] In the passages the Court has been able to identify, Mr. Rudy's support of these points appears tepid.

---

[73] *Id.*
[74] *Id.* Ex. Z1 at 204; Docket No. 67 Ex. BB, at 40–41; Docket No. 103 Ex. AA-1, at 116.
[75] Docket No. 103, at 39.
[76] *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir.1991).

Q. Okay. Would the financial strength of the guarantor and the relationship with the bank have been a factor that you think would have been considered by the bank in deciding whether or not to make a large disbursement based on stored materials?

A. I guess it could. It really shouldn't, but -- long history, strong financials, maybe.[77]

In contrast, Mr. Rudy's testimony clearly shows that he thought the stored materials draw was irregular, supported Plaintiff's termination, and felt that the decision was reached "as a collective" based on "lost confidence" in Plaintiff's judgment.[78]

Plaintiff also claims that Brian Bebel made representations to the other decision makers about Mr. Seastrand's interactions with Morinda in 2011 that were not based on personal knowledge and may not have been accurate. It is unclear what conflict this testimony presents. Plaintiff appears to protest that the decision to terminate Plaintiff was not based on adequately credible information. However, the Court cannot second guess U.S. Bank's business judgment. The Court's inquiry is only whether the employer honestly believed the reasons given for termination, and whether the employer acted in good faith.[79] For the reasons discussed, the Court concludes that the bank did.

Plaintiff also argues that Defendant's witnesses are not credible because they testified that Plaintiff had the ability to approve the stored materials draw and that approval of the stored materials draw created financial risk or loss to the bank.[80] Plaintiff submits that these allegations

---

[77] *Id.* Ex. AA-1, at 121.
[78] *Id.* at 77; *Id.* at 94 (At loan origination the borrower requested a draw of 7.1 million of which 4.3 million was for stored materials, which was not something the bank would typically consider at such an early stage); *Id.* at 58 ("Worst case loss, 8.1 million outstanding. 3.5 to 5 million potential loss.").
[79] *Swackhammer*, 493 F.3d at 1170.
[80] Docket No. 103, at 39–41.

are "absurd" and defeat the witness' credibility.[81]  Whether Plaintiff approved the stored materials

draw is an important issue in this case and is not resolved by name calling.  U.S. Bank's assessment

of the financial risk associated with the stored materials draw is a matter of business judgment.

  b. *Plaintiff's contention that age was a primary factor in US Bank's decision to terminate him.*

  Plaintiff argues that age was a primary factor in his termination as evidenced by the fact

that his direct supervisor, Ralph Pace, had a history of discriminating against older employees.

Plaintiff presents three affidavits from former employees who reported to Ralph Pace: Sandy

Sauer, Karen Klerman, and Marc Wright.[82]

  Each of these affiants testied that they had a record of strong performance in their roles at

U.S. Bank,[83]  but were targeted by Ralph Pace because of their age.[84]  All three affiants testied

that Ralph Pace had a reputation for favoring and promoting younger, less experienced employees,

at the expense of older employees.[85]

  Sandra Sauer and Karen Klerman reported to Ralph Pace when he managed U.S. Bank's

Denver office.  Sandra Sauer was terminated in 2012.[86]  In 2013, Karen Klerman "decided to find

a new job at another bank before [she] could be forced out/fired by Ralph Pace."[87]  Marc Wright

reported to Ralph Pace when Mr. Pace managed U.S. Bank's Seattle office.  Marc Wright left U.S.

---

[81] *Id.* at 41.
[82] Docket No. 103 Exs. GGG, HHH, III.
[83] *Id.* Ex. GGG, at 2; Ex. HHH, at 2–3; Ex. III, at 2.
[84] *Id.* Ex. GGG, at 3; Ex. HHH, at 2; Ex. III, at 2–3.
[85] *Id.*
[86] *Id.* Ex. GGG, at 7.
[87] *Id.* Ex. III, at 7

Bank in 2015. He testified that he accepted an early retirement out of fear that Ralph Pace was going to fire him.[88]

This circumstantial evidence does not create a genuine dispute of material fact. The Tenth Circuit has "cautioned that anecdotal evidence of discrimination should only be admitted if the prior incidences of alleged discrimination can somehow be tied to the employment actions disputed in the case at hand."[89] In this case, there is no clear connection between these alleged instances of discrimination and the case at hand. The three affiants do not offer any specific instances or details of how Mr. Pace discriminated against them on the basis of age. Rather, each merely believes that was the case. The alleged prior instances lack temporal and geographic proximity to the case at hand— having taken place in Denver and Seattle, between one and four years before Mr. Seastrand was terminated. The primary connection is that, in all cases, Ralph Pace was the direct supervisor. However, in the case before the Court, Ralph Pace was not the sole decision maker in U.S. Bank's determination to terminate Plaintiff. Brian Bebel, Director of Human Resources, and Rex Rudy, Head of Commercial Real Estate, were also involved in the decision.[90] Plaintiff himself argues that one of the other three decision makers, Brian Bebel, could be considered the main driver of the decision because he had discriminatory intent and exerted influence over the other decision makers.[91] Therefore, Ralph Pace's involvement alone is not an adequate connection to tie the alleged prior instances to the current case.

---

[88] *Id.* Ex. HHH, at 4.
[89] *Fassbender v. Correct Care Sols.*, LLC, No. 17-3054, 2018 WL 2208473 (10th Cir. May 15, 2018) (internal quotations and citations omitted).
[90] Docket No. 67 Ex BB, at 27–28; Docket No. 103 Ex. AA1, at 19–22.
[91] Docket No. 103, at 36.

Plaintiff also provides a chart produced by U.S. Bank that purports to include all the U.S. Bank employees who have reported directly to Ralph Pace and their respective ages and job histories.[92]  In reference to this chart, Plaintiff claims that

> [s]ince being hired by U.S. Bank, Pace has had 7 direct reports, all of whom were ages 48 to 60.  All positions reporting to Pace have been vacated by older employees and have been filled with younger, much less experienced employees ranging from 29 to 35.[93]

This argument appears to be incomplete or incorrectly formulated for a several reasons. First, according to the chart Plaintiff relies on, far more than seven people have reported directly to Ralph Pace.  Second, the chart appears to be incomplete.  For example, it does not include John Seastrand or Marc Wright.[94]  Third, several employees over the age of 40 are listed as having received competitive promotions.  Plaintiff makes no attempt to explain these discrepancies.  Even assuming that this data supported the assertion that Ralph Pace had engaged in discriminatory conduct in the past, as stated above, the causal connection to the case before the Court is interrupted by the fact that Ralph Pace did not act alone in making the decision to terminate Plaintiff.

Plaintiff also argues that U.S Bank's Human Resources Department ("HR") is another factor that ties the prior instances to the current case.  Plaintiff claims that Mr. Pace's actions in "driving out all of his older employees" are consistent with an official HR policy—the Hub Restructuring Initiative ("Hub").[95]  In 2016, U.S Bank began a new initiative to centralize the underwriting functions performed in each of U.S. Bank's twenty-five commercial real estate

---

[92] *Id.* Ex. WW, at 12–13.
[93] Docket No. 103, at 41.
[94] *Id.* Ex.WW, at 12.
[95] Docket No. 103, at 43–44.

markets.[96]  Under the new initiative, some functions would be centralized and performed in five or six "hubs."[97]  Under this initiative, U.S. Bank planned to "reduce[] personnel underwriting costs by hiring less-experienced staff."[98]

Plaintiff provides a chart, produced by U.S. Bank, giving the name, title, and age of every employee hired since the introduction of the Hub Restructuring Initiative.  Although a review of this chart does suggest that over this time period U.S. Bank hired a number of employees in their twenties and thirties, other age groups are also represented.[99]  Moreover, Plaintiff does not provide any data from any other time period that would help show that the hiring pool from this time period was irregularly young.  Rex Rudy, who initiated the Hub program, testified that Hub created positions that did not previously exist[100] and "did not displace current employees."[101] Mr. Rudy also testified that the "restructuring did not affect Mr. Seastrand."[102]

Plaintiff has failed to show a connection between either Ralph Pace's alleged prior acts of discrimination and the Hub program, or the Hub program and the current case.  The program began in 2016, after Sandy Sauer, Karen Klerman, and Marc Wright had all left U.S. Bank.  Moreover, it is unclear from Plaintiff's argument how or why a program focused on low-skill jobs would impact employees in senior positions like Plaintiff.

---

[96] *Id.* Ex. AA-1, at 129.
[97] *Id.* at 30.
[98] *Id.*
[99] Docket No. 103 Ex. WW, at 9–12.
[100] *Id.* Ex. AA-1, at 133.
[101] *Id.* at 130.
[102] *Id.*

Plaintiff also presents testimony from another former U.S. Bank employee, Shane Giddings, as evidence of "managerial atmosphere of discriminatory intent."[103]  Giddings testifies that in 2018, a member of U.S. Bank's senior management (who is not involved in this case), told employees, "I'm glad this bank is no longer run by tall, middle-aged white guys anymore."[104]  Giddings also testified that although he applied internally for numerous different positions at U.S. Bank, he was not invited to interview for the majority of them.[105]  Mr. Giddings also testified that in relation to one of the jobs he did interview for, he was told off-the-record that the position was offered to a female applicant because she was female.[106]

Mr. Giddings' testimony is of limited value in this case.  The events he recalls are not tied to the case before the Court.  Moreover, Mr. Giddings' complaints appear to focus on gender, rather than age, discrimination at U.S. Bank.

Finally, Plaintiff alleges that his own past treatment at U.S. Bank is evidence of pretext. Plaintiff claims that Ralph Pace denied him the opportunity to apply for a promotion—and asserts that Mr. Pace admits taking that action.[107]  This assertion relies on deposition testimony from Plaintiff and Ralph Pace, while also embellishing those testimonies.

In his deposition, Plaintiff recalled giving Ralph Pace a ride to the airport and mentioning that he "wouldn't mind looking" at a lateral position in Seattle.  Ralph Pace reportedly told him, "I've already got it figured out."[108]  Ralph Pace also recalled this conversation in his deposition,

---

[103] Docket No. 103, at 26, 44.
[104] *Id.* Ex. FFF, at 58.
[105] *Id.* at 77.
[106] *Id.* at 78-79.
[107] Docket No. 103, at 43.
[108] *Id.* Ex. Y-1, at 33.

stating that he recalled Mr. Seastrand initiating one conversation about applying for the job in Seattle, but that it was late in the process and U.S. Bank was already "down the road" with another applicant.[109]

Plaintiff's testimony suggests that he was not invited to apply for a lateral position, not that he was denied the opportunity to apply for a promotion. Contrary to Plaintiff's assertion, Ralph Pace does not admit denying him the opportunity to apply. Moreover, Plaintiff's assertion that the position was given to someone else because of age-based animus is without evidentiary support.

## V. CONCLUSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[110] Construing all facts and reasonable inferences in the light most favorable to Plaintiff, the nonmoving party, he has not shown that "there is a genuine issue of material fact as to whether the defendant's articulated reason for the adverse employment action was pretextual."[111] In light of the presented evidence, U.S. Bank's reasons for terminating Plaintiff are not "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." Therefore, the Court will grant the Motion for Summary Judgment.

---

[109] *Id.* Ex. Z-1, at 242.
[110] Fed. R. Civ. P. 56(a).
[111] *DePaula*, 859 F.3d at 970.

It is therefore

ORDERED that Defendant U.S. Bank's Motion for Summary Judgment (Docket No. 66)

is GRANTED.

DATED this 7th day of June 2019.

BY THE COURT:

_____

Ted Stewart
United States District Judge